UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:23 CV 1597 JMB |
| | ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM and ORDER**

Now pending before the Court is the Defendant's Motion for Summary Judgment (Doc. 102). For the reasons set forth below, the Motion is **GRANTED in part, DENIED in part, and TAKEN UNDER ADVISEMENT in part**.

**Introduction**

Bryan Patterson was working on a train and railroad track for Union Pacific Railroad Company shortly after midnight on December 18, 2020 with fellow employees when they observed an unknown assailant located in an adjacent parking lot shooting in their direction with a rifle. While none of the employees were physically injured as a result of the shooting, Plaintiff suffered from Post-Traumatic Stress Disorder and has not returned to work, being on indefinite medical leave. Plaintiff seeks a safe place to work and believes that Union Pacific is failing to accommodate his needs in a timely manner even though he is ready and willing to return to work. Union Pacific believes that it has done everything it reasonably should do to accommodate Plaintiff's needs, but that Plaintiff has failed to take advantage of what has been offered.

In his Amended Complaint (Doc. 38), Plaintiff alleges that Defendant was negligent in providing an unsafe work environment, failed to protect him from foreseeable violent acts, and is

liable under the Federal Employee's Liability Act (FELA), 45 U.S.C. § 51, *et seq*. (Count I). Plaintiff further alleges that he was discriminated against for reporting a work-place injury and safety concerns in violation of the Federal Rail Safety Act (FRSA), 49 U.S.C. § 20101, *et seq*. (Count II). As to his disability, Plaintiff claims that Defendant failed to accommodate his medical needs and retaliated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (Counts III and IV).[1] Finally, Plaintiff alleges a state law claim pursuant to Missouri's Human Rights Act (Count V).[2]

For the reasons set forth below, Defendant is entitled to judgment on Counts I (FELA) and II (FRSA). Defendant is not entitled to judgment on Counts III (ADA discrimination) and V (MHRA). And, this matter is taken under advisement as to Count IV (ADA retaliation).

**Standard**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Id.

---

[1] Count IV will be considered in conjunction with Defendant's Motion for Judgment on the Pleadings as to that Count (Doc. 124).

[2] Counts VI (negligence) and VII (loss of consortium) against ICL Specialty Products, Inc. were dismissed on September 10, 2024 (Docs. 53 and 127).

at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. Id. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248. In ruling on a motion for summary judgment, the court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. Id. at 255.

**Background**

The following relevant facts are undisputed for summary judgment purposes except where noted. To the extent that a response to an undisputed fact does not actually controvert that fact or which interjects new and irrelevant information, the response will be ignored (See, e.g., Plaintiff's response to Defendant's Statement of Uncontroverted Material Facts (DSUF) ¶¶ 6, 21, 30, Doc. 111, pp. 4, 15, 20). To the extent that a proposed material fact is not supported by the evidence cited, it will be ignored (See, e.g. DSUF ¶16 as to "management").

Plaintiff was working as a yardman/conductor/foreman and was operating a train, along with other Union Pacific Railroad (UPRR) employees, Tom Jones (a switchman) and Derrick Tindall (a locomotive engineer), in the early morning hours of December 18, 2020. They were travelling from UPRR's Lesperance Yard, located on the Mississippi River just south of the McArthur Bridge, to a facility owned by ICL Specialty Products, located 10 miles south at 8201 Idaho Avenue in St. Louis, Missouri (the "Fyler job" – which includes 12 miles of track). As Plaintiff was on foot with Jones and near a switch stand at the Broadway Junction lead track, shots were fired in his direction from a vehicle parked in a lot near the tracks and Virginia Avenue, close to and just east of the ICL facility. Plaintiff observed a man with a rifle who was firing from a black SUV. The parties dispute exactly what or who the shooter was aiming for, the switch stand,

Plaintiff, or the other UPRR employees, but there is no question that the shots were fired in Plaintiff's and the other employees' direction.[3] No person was physically harmed during the shooting. Chad Hindman, a special agent (police officer) employed by UPRR, responded to the scene an hour later but did not find "any physical evidence that they were shot at." (Doc. 111-4, p. 6).[4] Neither the black SUV nor the driver were apprehended. Immediately after the incident, when Plaintiff reentered the engine/train, he looked visibly disturbed, shaken, and generally upset (Doc. 111-3, p. 12). Plaintiff has not returned to work at UPRR since the shooting incident.

As a result of the shooting incident, Plaintiff developed Post-Traumatic Stress Disorder and sought treatment from Dr. Christina Robins, his primary care physician, and Janice A. Mills, a therapist (DSUF ¶ 12). In an April 21, 2022 letter to UPRR,[5] Dr. Robins cleared Plaintiff to return to work on June 20, 2022[6] in an alternative position to his previous position, with some restrictions (Doc. 111-11). Namely: "a managerial position or another sector that does not require him to constantly be placed in compromising situations due to environmental risks seems to be more appropriate" (Id.). Dr. Robins further suggested that if such a position was not available, she would recommend that he could not return to work and that he should seek alternative employment (Id.). Counselor Mills stated, in a May 26, 2022 letter to UPRR,[7] that: "Mr. Patterson may need

---

[3] The intent of the shooter does not appear relevant to this lawsuit.

[4] Page references are to the page numbers generated by CM/ECF.

[5] The letter is addressed "To Whom it May Concern" and is not addressed to UPRR. Defendant objects that the letter is hearsay and not authenticated. However, it appears undisputed that the letter was delivered to UPRR and the Court can infer that UPRR personnel reviewed the letter at some point in time.

[6] Prior to this date, Plaintiff was on FMLA leave and on non-pay status.

[7] This letter is directed to "Thomas K. Reimers, Employee Assistance Manager." The parties do not clarify who this person is or how he is related to Plaintiff's claims. However, he appears to be an employee of Defendant. Defendant objects that the letter is hearsay and not authenticated; however, Defendant admits that it received the letter at some point in time.

to change his occupational position due to the high level of perceived risk and probability of reoccurrence of a similar life-threatening incident" (Doc. 111-10). She noted Plaintiff could return to work on June 1, 2022, that he could not perform his previous job, and that he required a position "that does not put him in a reoccurring vulnerable or unsafe working condition" (Id.). Plaintiff himself believed that he would need to "try to avoid places that are going to cause me any kind of a stressful triggering event based on safety and security and like situations where I feel unsafe" (DSUF ¶ 13).

Plaintiff's return to work and accommodation process were managed by vocational case managers including Kristi Deardorff[8] and Kim Foye.[9] Defendant's goal is to return personnel to work as quickly as possible after receiving clear restrictions from their medical providers (Doc. 111-9, pp. 14-15). According to a "Medical Comments History" (Doc. 117-14), the vocational case managers began involvement in Plaintiff's claims on May 18, 2022. On May 26, 2022, they believed that Plaintiff "will be a possible candidate to review alternative positions" and determined to contact Plaintiff (Id. p. 6). It then notes that Plaintiff was on a medical leave of absence ("MLOA") until July 18, 2022 (Id.). It is undisputed that neither Ms. Deardorff nor Ms. Foye contacted Plaintiff until Ms. Deardorff sent to Plaintiff a medical certification request on December 2, 2022 (PSUF ¶¶ 67-68). There is a factual dispute as to when and whether that form was completed and returned to Defendant (See PSUF ¶¶ 73 and response; Doc. 117-14, p. 5). Thereafter, Ms. Deardorff had a conversation with Plaintiff on May 23, 2023 that appears contentious (PSUF ¶ 71 and response) and requested additional information on June 14, 2023

---

[8] The records indicate that her full name is Kristi Girard-Deardorff.

[9] The parties' presentation of evidence related to Plaintiff's accommodation requests and return to work is disorganized and confusing. It would be impossible for the Court to address every objection and statement made by the parties with respect to Plaintiff's interaction with Defendant after his injury. Accordingly, the following facts are a general statement of what happened.

(PSUF ¶ 71 and response). Dr. Robins authored a letter dated June 23, 2023, purportedly setting forth her assessment of Plaintiff's work limitations.[10]

During this time period, June and July, 2023, Dr. Laura Gillis, who was employed by UPRR as a medical director, became directly involved in Plaintiff's work accommodation requests (PSUF ¶ 75-76; Doc. 111-9, p. 8). Dr. Gillis denied Plaintiff's accommodation request (PSUF ¶ 57). In doing so, Dr. Gillis repeatedly testified that she was unable to receive clarification from Plaintiff regarding his specific restrictions in order to determine what an appropriate accommodation would entail (See, e.g., Doc. 111-9, pp. 17-18). At the time, Dr. Gillis understood Plaintiff's accommodation request included a "work environment with zero risk liability associated with it" (PSUF ¶ 77). However, Dr. Gillis believes that Plaintiff could return to work "as a yardman or train service" at a location other than where the shooting incident occurred (Doc. 111-9, p. 16). The decision was relayed to Plaintiff in a July 11, 2023 letter (Doc. 111-13):

> We have reviewed the submitted documentation to support your request for accommodation. Your request is being denied as our review has determined you can perform the essential functions of your job within the restrictions that have been outlined by your Provider.
>
> (Id.).

Thereafter, the parties continued to interact as to Plaintiff's needs.[11] It is uncontroverted that Defendant requested information from Dr. Robins throughout her involvement in Plaintiff's care (DFUF ¶ 14) and that Dr. Robins responded (DSUF ¶ 19). On March 14, 2025, Defendant notified Plaintiff that it would attempt to find him an alternative position (PSUF ¶ 87 and response). It appears that Defendant neither offered Plaintiff an alternative position and Plaintiff himself did

---

[10] The letter does not appear to be part of the record and Defendant objects on hearsay and authentication grounds.

[11] Plaintiff filed this lawsuit on December 12, 2023. Prior to that date, on at least March 25, 2022, it appears that Plaintiff's attorney, Mr. Patrick Poston, was in direct communication with Defendant regarding Plaintiff's return to work status. Indeed, Mr. Poston reminded Defendant, on June 7, 2022 that "all [return to work] [ ] communication to be directed to me" (Doc. 117-22).

not identify any alternative position that he would do. On October 1, 2025, Dr. Robins provided a "Return to Work Status Form" stating: "cannot return to railyard, inside or managerial position needed. Away from environment of danger" and that these restrictions are permanent (Doc. 104-9).

It is undisputed that an essential job function of a trainman (which include brakeman, switchman, conductor, hostler, and remote control operator) is focusing and concentrating (DSUF ¶ 34). Plaintiff has had difficulty focusing and concentrating when he is stressed out and depending on whether he is in a comfortable and safe environment (DSUF ¶¶ 34-35). It also appears that Plaintiff's employment is subject to a Collective Bargaining Agreement, although that document is not a part of the record (See Doc. 117-13, p. 20). There appears to be no dispute that there are open positions available at UP (PSUF ¶ 92 and response) although it is unclear the details of these jobs, whether Plaintiff is qualified for these positions, and whether Plaintiff wants to work any of these jobs.

The parties dispute whether each of them meaningfully engaged in the interactive process to find Plaintiff an appropriate and available position at UPRR. It is undisputed, however, that Plaintiff's employment has not been terminated, that he is still considered on medical leave, that he has not been offered an alternative position,[12] that Plaintiff has not suggested a particular open position that he finds acceptable, and that he has not returned to work at UPRR.

Plaintiff filed a complaint with Occupational Safety and Health Administration (OSHA), the Equal Employment Opportunity Commission (EEOC), and the Missouri Human Rights Commission on December 15, 2022 (PSUF ¶ 70).

---

[12] In response to a number of Plaintiff's undisputed facts, Defendant denies that it has not offered Plaintiff jobs. However, these statements are not supported by citation to the record (See PSUF ¶¶ 89, 92 and responses).

## Discussion

1. FELA (Count I)

The Federal Employees' Liability Act, 45 U.S.C. § 51, *et seq*., provides that:

> Every common carrier by railroad . . . , shall be liable in damages to any person suffering injury while he is employed by such carrier . . . , for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

"FELA imposes upon employers a continuous duty to provide a reasonably safe place to work." Miller v. Union Pacific R.R. Co., 972 F.3d 979, 983 (8th Cir. 2020) (citing Cowden v. BNSF Ry. Co., 690 F.3d 884, 889 (8th Cir. 2012)). In order to prevail on this claim, Plaintiff must prove the common law elements of negligence: duty, breach of that duty, foreseeability, causation, and damages. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542-544 (1994); Miller, 972 F.3d at 987-988. While there is a relaxed standard for causation and foreseeability in light of the remedial nature of FELA, Holloway v. Union Pacific R.R. Co., 762 Fed.Appx. 350, 52 (8th Cir. 2019), "reasonable foreseeability of harm is an essential ingredient of FELA negligence." Burckhard v. BNSF R.R. Co., 837 F.3d 848, 853-854 (8th Cir. 2016) (citing CSX Transp. Inc. v. McBride, 564 U.S. 685, 702-703 (2011)). Thus, "'[i]f a person has no reasonable ground to anticipate that a particular condition ... would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition.'" Cowden, 690 F.3d at 896 (quoting Gallick v. Baltimore & O. R. Co., 372 U.S. 108, 118 n.7 (1963)).[13]

[13] In reversing the district court's grant of summary judgment for the railroad, the 8th Circuit found that there were questions of fact that should be determined by the jury:

> Cowden presented evidence that BNSF knew of problems with the stretch of track in question before the accident. Thus, the proper foreseeability question for the present case is whether a reasonably prudent person who knew of the reported problems would have anticipated an injury to occur as a result of operating a train over that stretch of track at the same speed. Relevant to this consideration

Plaintiff argues that his injuries were foreseeable and caused, at least in small part, by Defendant's negligence because it had a "non-delegable and absolute duty to provide a safe workplace throughout its operational system" (Doc. 112, p. 9). In particular, Plaintiff argues that Defendant should have known that the Fyler job was performed on a particularly dangerous section of track and should have taken precautions against the harm that befell him. Plaintiff appears to imply that Defendant had a *per se* duty to protect him from the actions of a third party, which is not the law. Even though minimal evidence is required for foreseeability and causation, Plaintiff's evidence is insufficient as a matter of law. See Lager v. Chicago Northwestern Transp. Co., 122 F.3d 523, 525 (8th Cir. 1997). Indeed, Plaintiff relies on a combination of speculation, vagaries and mischaracterization of the evidence to support his claims (PSUF, Doc. 111, pp. 48-59). Putman v. Unity Health Sys., 348 F.3d 732, 733–34 (8th Cir. 2003) ("To survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." (citation, quotation marks and editing marks omitted)).

Plaintiff claims that "[i]t is common to hear gunshots when working the Fyler job" (PSUF ¶ 11), that the area of the shooting is occupied by "lots of vagrants" (Id. ¶ 15) and a "homeless camp" (Id. ¶ 17), and that Tindall did not alert his coworkers or others as to the "suspicious" vehicle, which he should have done (Id. ¶ 19, 24). Plaintiff argues that Defendant was negligent in failing to mitigate the incidence of gun violence, failing to mitigate the presence of vagrants or homeless people, failing to provide extra security in light of these hazards, by Tindall failing to report suspicious activity, and generally failing to increase security in the area of the shooting.

---

> is the evidence that BNSF adopted more restrictive slow orders because of these problems, and then purportedly removed those restrictive slow orders without fixing the root problem.

Cowden, 690 F.3d at 896-897.

Thus, Plaintiff claims that Defendant had actual and constructive knowledge of the danger and failed to take reasonable steps to mitigate the danger. The evidence cited does not support these contentions.

For example, Plaintiff relies on Tindall's testimony that gunshots were actively heard around the area of the shooting. However, Tindall testified that such sounds are not uncommon near Lesparance yard and that they are very uncommon near the ICL facility and not near the facility either:

> Q. Is it common to hear gunshots when you're working this job?
> A. I wouldn't say it's uncommon to hear gunshots around the yard.
> Q. Okay. And that's – you're working Lesperance –
> A. Yes.
> Q. – when you say 'the yard'? When you're serving this job and you're out servicing these industries on this YSL51 or Fyler job, not uncommon to hear gunshots?
> A. It's very uncommon at the industries.
> Q. At the industries?
> A. Yes.
> Q. Uncommon but it's – it happens?
> A. Yes.
>
> ***
>
> Q. Okay. But not uncommon to hear gunfire while you're working the Fyler job, correct?
> A. Not uncommon, but not close to the facility either.

(Doc. 111-3, p. 5). Tindall went on to testify that he only reported two incidents of gunshots while at the industries, the incident in this case and another that occurred later in time (Doc. 111-3, p. 6). At best, Tindall's testimony is that he heard some gunshots over a period of the three years that he worked the Fyler job, that none were close to the ICL facility, and that he never reported any such incidents to UPRR prior to the incident in question. Such vagaries do not make gunfire and shootings foreseeable near the ICL facility.

Plaintiff's similar assertions also fail to demonstrate foreseeability. Plaintiff does not connect his contention that vagrants and a homeless encampment near the tracks make it foreseeable that he would be subject to violence. There is no showing that Defendant knew or had reason to know that "dangerous characters" frequented the area of the shooting such that Defendant could have reasonably foreseen a shooting incident. Lillie v. Thomspon 332 U.S. 459, 460-461 (1947).[14]

Plaintiff's strongest evidence, although still insufficient to reach a jury, is that Tindall failed to report the truck in the parking lot as they were approaching the ICL facility. See Sinkler v. Missouri Pac. R.R. Co., 356 U.S. 326, 330 (1958) ("[A] railroad worker may recover from his employer for an injury caused in whole or in part by a fellow worker . . . ."). While he believed that it was "out of place" because there is normally not a vehicle in that parking lot (Doc. 111-3, p. 10), he made a "mental report" and not an actual report to UPRR because "[n]othing had occurred. There's no need to report anything" (Doc. 111-3, p. 10). He also did not find the vehicle "suspicious"[15] because he did not observe a driver, a weapon, or that the vehicle was impeding operations (Doc. 117-3, p. 2). Merely noting an out-of-place vehicle (that was not impeding work operations or safety) is not "evidence showing a genuine issue of material fact that UP had a reasonable ground to anticipate that a particular condition would or might result in a mishap and injury." Miller, 972 F.3d at 988 (editing marks and citation omitted). It is entirely speculative that an out of place vehicle would make it foreseeable that Plaintiff would suffer injury. Plaintiff has simply presented no evidence that Defendant had reason to know or anticipate that Plaintiff would

[14] Finding for the worker, the Supreme Court also noted that the area of the assault in that case was unlighted, there were not security guards or patrols at all, and there was no way for the worker to have seen the person who assaulted her prior to opening a door she was required to open for trainmen. Lillie, 332 U.S. at 460-461. There is no evidence of such circumstances or similar circumstances in this case.

[15] Plaintiff cites to Tindall's deposition for the proposition that he found the vehicle "suspicious"; however, Tindall testified that the vehicle was out of place, not that it was suspicious (Doc. 111-3, p. 10).

be shot at. Likewise, that Defendant may have had police officers on patrol more frequently or visibly or at the time of the incident or other security measures is insufficient. Id. ("The mere existence of alternate safer methods alone does not establish negligence under FELA."). Plaintiff only speculates that there were both no reasonable security measures in place and that additional security measures would have prevented the incident; he provides no competent evidence to support this claim. Plaintiff cannot defeat summary judgment with speculation. Bloom v. Metro Heart Group of St. Louis, Inc., 440 F.3d 1025, 1028-1029 (8th Cir. 2006). Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's FELA claim (Count I).

2. ADA Discrimination (Count III)

The Americans with Disabilities Act prohibits discrimination on the basis of disability. 42 U.S.C. § 12112. Employers are required to provide "reasonable accommodations to the known . . . mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." Id. § 12112(b)(5)(A). To prevail on his discrimination claim, Plaintiff must show that he: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment decision because of the disability." Kendall v. Zoltek Corp., 175 F.4th 1002, 1007 (8th Cir. 2026) (quotation marks and citation omitted); Denson v. Steak 'n Shake, Inc., 910 F.3d 368, 371 (8th Cir. 2018). For summary judgment purposes, there is no dispute that Plaintiff is disabled within the meaning of the ADA.

Plaintiff is "qualified" if he has the education and skills to perform the job and is able to perform "essential job functions with or without reasonable accommodations." Kendall, 175 F.4th at 1007 (quotation marks and citation omitted). "Essential job functions" include "'the fundamental job duties of the employment position the individual with a disability holds or

desires.'" Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003) (quoting 29 C.F.R. § 1630.2(n)(1)). A "reasonable accommodation" is "modifications or adjustment to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Such an accommodation can include transfer to a vacant position. Id at § 1630.2(o)(2)(ii). An employer should engage in "an informal, interactive process with" the individual to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." Id at § 1630.2(o)(3). An employer "is required, absent undue hardship, to provide a reasonable accommodation . . . ." Id at § 1630.2(o)(4). However, Plaintiff "bears the initial burden of demonstrating that he requested reasonable accommodations . . . and that those accommodations would render him otherwise qualified" for a job. Mershon v. St. Louis Univ., 442 F.3d 1069, 1077 (8th Cir. 2006). Defendant argues that Plaintiff cannot show that he is a qualified individual, that he suffered an adverse job action, or that he was subjected to intentional discrimination.

The only qualifications for Plaintiff's position as a yardman (or a transportation, TE&Y employee) that Defendant highlights are focus and concentration. Kendall, 175 F.4th at 1008 (in determining essential functions of a job, factors considered are "employer's judgment, the written job description . . . , consequences of not requiring plaintiff to perform the functions, and the current work experience of incumbents in similar jobs"). As noted above, Plaintiff may lose focus and concentration if he is placed in an (perceived) unsafe situation. However, Defendant also indicated that "[y]our request is being denied as our review has determined you can perform the essential functions of your job *within the restrictions that have been outlined by your Provider*" (Doc. 111-13 (emphasis added)). It is unclear what restrictions Defendant relied on in determining

that Plaintiff can in fact perform the essential functions of his job. There is no suggestion from the record that his treatment providers mention an accommodation for focus and concentration and there is evidence that his treatment providers indicated he cannot perform his current job at all. Additionally, there is some oblique evidence that Plaintiff cannot and does not want to perform his job in the same manner and the same location as prior to the incident because his perception of his safety and security may trigger symptoms of his PTSD, which include lack of concentration and focus. There also is no discussion of whether Plaintiff has the essential qualifications to perform some other job at UP.

Defendant states that Plaintiff has not suffered an adverse job action because his employment has not been terminated. Plaintiff states, without evidence, that he is on unpaid medical leave.[16] While Plaintiff has presented no evidence that he has not been paid a salary over the past few years from Defendant, there does not appear to be any serious dispute that Plaintiff, while still technically employed, is on a medical leave of absence and has not received his salary (or hourly wage) from Defendant since the shooting incident. It appears to the Court that not receiving a paycheck is a change in the material terms of Plaintiff's employment. See Wenzel v. Missouri-American Water Co., 404 F.3d 1038, 103 (8th Cir. 2005) ("There must be a material change in employment status – a reduction in title, salary, or benefits."). At trial, however, evidence should be provided to support Plaintiff's assertions.

What Plaintiff is arguing is that "his employer failed to engage in the interactive process in good faith." Mobley v. St. Luke's Health Sys., Inc., 53 F.4th 452, 457–58 (8th Cir. 2022) ("[A]n employee must demonstrate that the employer knew about his disability, [ ] that the employee

[16] Doc. 112, p. 20. Plaintiff briefly argues that his status is akin to constructive discharge, citing Kingharper v. Union Pacific R.R. Co., 2024 WL 6948293 (W.D. Mo. 2024). In light of Plaintiff's failure to actually argue the point, the Court will not address this contention.

requested an accommodation," that the employer "did not make a good faith effort to assist the employee in seeking accommodations," and that he "could have [been] reasonably accommodated." (citation omitted)). The interactive process is two sided: and employee must provide an understandable and reasonable accommodation request and an employer must go about finding positions that would work, within reason. Thus,

> Once the employer is made aware of the legitimate need for an accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. This means that the employer should first analyze the relevant job and the specific limitations imposed by the disability and then, in consultation with the individual, identify potential effective accommodations. This division of responsibility is only logical, as an employee will typically have better access to information concerning his limitations and abilities whereas an employer will typically have better access to information regarding possible alternative duties or positions available to the disabled employee.

E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc., 491 F.3d 790, 795 (8th Cir. 2007) (quotation marks and citations omitted). Importantly, "[w]hether an accommodation is reasonable is a question of fact to be decided by a jury." Id. at 796.

In this case, there are open questions of whether either party acted reasonably and in good faith. On the one hand, Plaintiff provided vague statements of the accommodations he required – at varying points, he requested a managerial job, an "inside" job, a job that does not place him in "compromising situations" or "vulnerable or unsafe working conditions" or "triggering" situations. His treatment providers stated that he could not work his previous job. Plaintiff himself testified (more or less) that he could work as a yardman but just not in an unsafe environment. There is no specific indication in the record what Plaintiff would actually consider "safe" and Defendant may be accurate in its assessment that he wanted a "zero risk" job, which seems unreasonable. Plaintiff also offers no evidence that he was qualified for any of the "manager" or

"inside" jobs that he suggests exist, or for any other job at UPRR. A jury may also find that the interjection of his attorney as a go-between may demonstrate a lack of good faith.

On the other hand, a jury may find that Defendant's efforts in engaging with Plaintiff may be unreasonable in light of the months between contact and Defendant's expectation that Plaintiff should search out jobs for which he is qualified and which he wanted to work by himself. Finally, Defendant states that "[f]urther, to accommodate Plaintiff's restrictions, as they ostensibly disqualify him from work in the TY&E craft he occupied for 14 years as a unionized employee, would present an undue hardship on UPRR and unreasonably interfere with a valid bona fide seniority system, something that is categorically not required under the ADA" (Doc. 103, p. 26). This statement is unsupported by the record. There is no evidence presented that Defendant would suffer undue hardship in accommodating Plaintiff in his current job nor is there evidence that giving him another job would interfere with a "seniority system," whatever that may be. Either way, whether either party acted reasonably or in good faith is a jury question.[17]

3. Retaliation pursuant to FRSA (Count II) and the ADA (Count IV)

The Federal Rail Safety Act (FRSA), 49 U.S.C. § 20101, *et seq*., prohibits railways from retaliating against employees for reporting workplace injuries. Carter v. Sec'y Dep't. of Labor, 108 F.4th 1028, 1030 (8th Cir. 2024). In order to make a prima facie case, Plaintiff must show that he engaged in protected activity, that Defendant knew or suspected that he engaged in such activity, and that the protected activity was a contributing factor to an adverse employment action. Neylon v. BNSF Ry. Co., 968 F.3d 724, 727-728 (8th Cir. 2020). To prevail on his claim, Plaintiff must show intentional retaliation. Id.; Heim v. BNSF Ry. Co., 849 F.3d 723, 727 (8th Cir. 2017).

[17] This question reaches the jury only because of the summary judgment standard requiring the Court to view the evidence in a light most favorable to the Plaintiff.

It is insufficient to merely show "erroneous company findings." Foster v. BNSF Ry. Co., 866 F.3d 962, 969 (8th Cir. 2017).

Defendant first argues that Plaintiff has not suffered an adverse job action because he is still employed. FRSA broadly provides that employers may not "discharge, demote, reprimand, or in any other way discriminate against an employee" for reporting a safety violation. 49 U.S.C. § 20109(a). As indicated above, it appears undisputed that there has been a "disadvantageous change to [Plaintiff's] compensation": he has not been paid his salary since the incident. Cole v. Group Health Plan, Inc., 105 F.4th 1110, 1114 (8th Cir. 2024) (discussing Title VII). Certainly, placing an employee on indefinite medical leave without pay and without a path forward could "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) (quotation marks and citation omitted). Accordingly, it is reasonable to find that indefinite medical leave without pay is an adverse employment action.

Defendant next argues that there is no causal connection between Plaintiff's report of safety violations or injury/disability pursuant to FRSA and an adverse action. Plaintiff's claim appears to be that Defendant's *inaction* in putting him back to work is an indication of intentional retaliation under FRSA. Plaintiff cites to no case authority to support his position and it is difficult to understand how the actions of persons, who are not Plaintiff's supervisors and who have no apparent authority to give Plaintiff a job at UPRR, can retaliate against Plaintiff based on the evidence presented. There is no indication of any direct evidence of retaliation and Plaintiff's mosaic of circumstantial evidence revolves around disagreement, an "inconsistent application of UPRR's standard policies," failure to acquire what Plaintiff believes to be necessary information about "triggers," lack of information, confusion, and lack of understanding, hardly the hallmarks

of intentional retaliation. Plaintiff has not demonstrated that any particular decision-maker was incentivized to retaliate against him for reporting a workplace injury. See, e.g., Neylon, 968 F.3d at 730 (finding that general company policies must be connected to a supervisor's incentive to retaliate). As noted above, a jury may find that Defendant failed to act in good faith during the interactive process. Such a finding, however, does not necessarily mean that Defendant was intentionally retaliating against plaintiff for engaging in a protected activity, and Plaintiff has presented no case authority suggesting as much. Defendant is entitled to judgment on Count II.

As to the ADA retaliation, it appears to fail for the same reasons. Plaintiff states that the filing of a complaint with the EEOC and MCHR is the protected activity and that circumstantial evidence supports a causal connection between that activity and his placement on indefinite medical leave. Both parties agree there is no direct evidence of retaliation; Defendant argues that there is also no causal connection between Plaintiff's filings and an adverse action. Plaintiff filed his charge of discrimination on December 15, 2022. At that time, Plaintiff was already on unpaid medical leave. As such, Plaintiff must be arguing that his continued placement on unpaid medical leave is the adverse employment action along with Defendant's failure to place him in an appropriate position. Again, Plaintiff has only presented evidence from which a jury may conclude that Defendant did not act in good faith in attempting to accommodate his needs. Plaintiff has presented no case authority that would suggest that disagreements and missteps during the accommodation process by persons who are not Plaintiff's supervisors or decision makers would lead a reasonable jury to conclude that he was being retaliated against.

In any event, Plaintiff's ADA retaliation claim is the subject of Defendant's motion for judgment on the pleadings (Doc. 124), which is fully briefed. The Court will address the

arguments made by the parties in the this motion for summary judgment and related filings, if necessary, along with that motion for judgment on the pleadings.

4. MHRA (Count V)

In light of the above findings, the Court will retain jurisdiction over this Count V as to Plaintiff's claims of disability discrimination pursuant to state law.

**Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 102) is **GRANTED in part, DENIED in part, and TAKEN UNDER ADVISEMENT in part**. Judgment is **GRANTED** for Defendant and against Plaintiff on Counts I (FELA) and II (FRSA). Judgment is **DENIED** as to Counts III (ADA discrimination) and V (MHRA). And this matter is taken under advisement as to Count IV (ADA retaliation).

***/s/ John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of September, 2026